|   |   |
|---|---|
| UNITED STATES DISTRICT COURT | |
| DISTRICT OF NEVADA | |
| * * * | |
| VALERIE HARDY-MAHONEY, Regional Director of the Thirty-Second Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board,<br><br>Petitioner,<br>v.<br>PRIME HEALTHCARE SERVICES D/B/A SAINT MARY'S REGIONAL MEDICAL CENTER, RENO,<br><br>Respondent. | Case No. 3:17-cv-00216-MMD-VPC<br><br>ORDER |

**I.    SUMMARY**

Section 10(j) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.*, authorizes district courts to grant temporary injunctions that are "just and proper" pending the National Labor Relations Board's ("NLRB" or "the Board") resolution of unfair labor practice disputes. *See* 29 U.S.C. § 160(j). Before the Court is the Regional Director of the 32nd Region of the NLRB's petition for interim injunctive relief pursuant to section 10(j) against Respondent Prime Healthcare Services d/b/a Saint Mary's Regional Medical Center, Reno ("Petition"). The Court has reviewed Petitioner's brief (ECF No. 3), Respondent's response (ECF No. 17), and Petitioner's reply (ECF No. 19).

The Court heard oral argument on May 8, 2017. (ECF No. 20.) At the conclusion of the hearing, the Court ordered the parties to file supplemental briefs concerning its authority to narrow the relief sought by Petitioner pending the initial ruling of the Board's

Administrative Law Judge ("ALJ"). The Court has reviewed the supplemental briefs (ECF Nos. 22, 23).

For the reasons discussed below, the Petition is denied.

**II.    BACKGROUND**

The following facts are taken from Petitioner's brief and accompanying exhibits. (ECF Nos. 3, 3-1.)

This Petition involves two charges of unfair labor practices brought pursuant to sections 8(a)(1) and 8(a)(3) of the NLRA, 29 U.S.C. §§ 158(a)(1) & (a)(3). The California Nurses Association/National Nurses Organizing Committee/National Nurses United (collectively, "the Union") filed the first charge in Case 32-CA-157381 ("381 Case") on August 5, 2015 after Hospice Nurse Johna May ("May") was suspended. (ECF No. 1 at 3.) The Union subsequently amended the charge twice, on August 21, 2015, and September 3, 2015, alleging that May was terminated in retaliation for engaging in or supporting protected activities on behalf of the Union. The Union filed its second charge in Case 32-CA-162431 ("431 Case") on October 21, 2015, after Respondent purportedly solicited and promised to remedy the hospice nurses' grievances, granting wage increases and other changes to the hospice nurses' terms and conditions of employment. This charge was subsequently amended on January 1, 2016, and September 27, 2016. On December 29, 2016, the two cases were consolidated, and a Consolidated Complaint ensued. (*Id.* at 4.) A portion of the Consolidated Complaint was withdrawn via a February 22, 2017, order. On January 11, 2017, Respondent filed its Answer to the Consolidated Complaint. The initial administrative hearing is scheduled for June 20, 2017. (*Id.* at 5.)

The 381 Case arises from May's termination after an August 3, 2015, hearing in Case 32-RC-156669 ("669 Case"), which involves the Union's petition to include 24

///

///

///

hospice nurses in the existing bargaining unit[1] of the Union at St. Mary's Regional Medical Center in Reno ("Medical Center"). (ECF No. 3-1 at 4, 57.) At this hearing, the Union's counsel, Micah Berul ("Berul"), marked three exhibits for identification. One of the exhibits, an email, contained the personal health information ("PHI") of a patient, including the patient's name, medical condition, and date of birth. (*Id.* at 5; ECF No. 1 at 5.) At this point, counsel for Respondent, Mary Schottmiller ("Schottmiller"), and Berul spoke privately and off the record.[2] Schottmiller told Berul that Respondent would have to terminate May for disclosing PHI unless the Union withdrew the Representation Petition. (ECF No. 3-1 at 6.) Berul disputed whether May had been the one to give him the email and also told Schottmiller that Respondent had violated HIPAA by sending this email with PHI to fifteen recipients, an unnecessarily excessive number. (*Id.* at 6-7.) Once back on the record, Berul withdrew the email at issue and requested that all references to it in the transcript be stricken. (*Id.* at 7.) Nonetheless, Schotmiller informed Berul that Respondent was going to terminate May and was going to report Berul and John Welsh, the Union representative, for a HIPAA violation. (*Id.* at 9.) On August 5, two days after the hearing, Respondent suspended May while Respondent conducted an investigation. (*Id.* at 10; ECF No. 1 at 5.) Respondent terminated May on August 11. Before the August 3 hearing, May had participated in activities in support of and on behalf of the Union. (ECF No. 3-1 at 30-31.)

The 431 Case arises from Respondent's redress of hospice nurse complaints concerning wages and benefits, which occurred after May's termination. On August 19, 2015, several hospice nurses approached Piper Gals ("Gals"), the Director of Hospice at the Medical Center. (ECF No. 3 at 13.) Several days later, Gals met with a hospice nurse and instructed the nurse to email the other hospice nurses' requests to her. This list of requests included: "(1) a yearly cost of living raise; (2) continuing education

---

[1]The existing bargaining unit is comprised of approximately 560 registered acute care nurses at the Medical Center located at 234 West 6th Street, Reno, Nevada. (ECF No. 3-1 at 8.)

[2]The parties dispute part of the content of this discussion.

3

reimbursement for 24 hours of educational credits per year; (3) being placed on the same pay scale as the other registered nurses working for Respondent; (4) shift-differential pay for working evenings, nights, weekends, and in the pediatrics unit; (5) being paid at the regular rate for taking calls during the 5:00 PM to 8:00 PM shift; (6) being paid for 40 hours in a work week if some of those hours were from meetings or education time; (7) splitting weekend 12-hour shifts; (8) hiring an admitting nurse to help with weekend admissions; (9) phone coverage for Saturdays; (10) nursing oversight for referrals and admissions; (11) placing someone in the nursing office to assess acuity, caseloads, and nurse coordination; (12) ending the practice of hospice nurses finding their own coverage when they are sick and cannot work their shift; and (13) ending the practice of night shift covering home health patients during the night." (*Id.* at 13.)

On September 14, 2015, Gals met with about 13 hospice nurses and informed them that she would be taking four of the nurses' requests to management. (*Id.* at 14.) These requests included a 2-3 percent cost of living increase, a continuing education reimbursement, putting hospice nurses on the same pay scale as Respondent's other Union represented nurses, and providing a shift differential. On October 6, 2015, Gals held a meeting with all hospice nurses to inform them that Respondent had granted a wage increase, 24 hours of continuing education units, shift differential, and had agreed to perform a wage review to evaluate whether the hospice nurses were on the correct wage scale.[3]

The next month, November 2015, several hospice nurses collectively sent a letter ("November 2015 Letter") to the Union's representative, Jeff Welsh ("Welsh"), stating that they were no longer interested in the Union given that Respondent had met their needs. (ECF No. 3-1 at 134-35.) Welsh then stopped all organizing activities for the hospice nurses. (*Id.* at 135.)

---

[3]Petitioner's brief states that Gals subsequently emailed the hospice nurses on October 20 to inform them that these wage benefit increases would be implemented. (ECF No. 3 at 15.)

In the meantime, on August 14, 2015, the ALJ dismissed the petition in the 669 Case. (ECF No. 3-1 at 56-64.) The Board reversed and remanded the decision for further consideration. (*Id.* at 66.) On August 9, 2016, the ALJ issued its remand decision, overturning its prior findings and issuing a direction of election. (*Id.* at 65-74.)

On August 20, 2016, Welsh emailed the hospice nurses to let them know that the Regional Director had directed that an election take place. (*Id.* at 135.) He also called some of the hospice nurses to tell them the same news. Only one hospice nurse answered his call on August 31, 2016, to inform him that she was no longer interested in joining the Union and that, as far as she knew, the opinions of the other hospice nurses had not changed since they sent the November 2015 Letter. (*Id.* at 135-36.)

The Petition requests two forms of injunctive relief. First, the Petition asks the Court to enjoin and restrain Respondent from: (1) discharging, suspending, or otherwise discriminating against employees because they join or assist the Union or engage in concerted protected activity or discouraging employees from engaging in those activities; (2) threatening to discharge, suspend, or otherwise discriminate against employees unless the Union withdraws its Representation Petition; (3) impliedly promising employees that Respondent will remedy hospice nurses' complaints and grievances, in response to employees' Union organizing activities; (4) meeting with hospice nurses to resolve their complaints and grievances and/or to promise to resolve their complaints and grievances, in response to employees' Union organizing activities; (5) granting benefits in response to employees' Union organizing activities; and (6) in any like or related manner interfering with, restraining or coercing employees in the exercise of the rights guaranteed to them under section 7 of the NLRA. (ECF No. 1 at 10-11.)

The Petition also requests this Court to require Respondent to: (1) within 5 days of the Court's order and in writing, offer May immediate reinstatement to her former position, or, if her position is no longer available, to a substantially equivalent position without prejudice to her seniority or any other rights and privileges previously enjoyed and displacing any employee who has been hired or reassigned to replace her; (2) within

7 days of issuance of this Court's order, post copies of the Court's order at Respondent's Reno facility and maintain these postings during the Board's administrative proceeding with unrestricted access to employees while granting Board agents reasonable access to the facility in order to monitor compliance with the posting requirement; and, (3) within 20 days of the issuance of this Court's order, file with the District Court and serve upon the Regional Director of Region 32 of the Board, a sworn affidavit from Respondent describing with specificity the manner in which they have complied with the Court's orders and the locations of the posted documents. (ECF No. 1 at 11.)

### III. LEGAL STANDARD

"Section 10(j) permits a district court to grant [injunctive] relief it deems just and proper." *Frankl v. HTH Corp.*, 650 F.3d 1334, 1355 (9th Cir. 2011) (citing 29 U.S.C. § 160(j)) (internal quotation marks omitted), *cert. denied*, 566 U.S. 904 (2012). The purpose of section 10(j) is to ensure that an unfair labor practice will not succeed in dissipating union support because the Board takes too long to investigate and adjudicate the charge. *Miller for & on Behalf of N.L.R.B. v. California Pac. Med. Ctr.*, 19 F.3d 449, 460 (9th Cir. 1994).

However, "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 24 (2008). In the Ninth Circuit, to determine whether interim injunctive relief under section 10(j) is appropriate, the district court must rely on traditional equitable principles. *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180 (9th Cir. 2011); *Frankl*, 650 F.3d at 1355 (9th Cir. 2011). These equitable considerations require the Regional Director to satisfy four factors: (1) likelihood of success on the merits on final disposition of the Board's resolution; (2) a likelihood of irreparable harm in the absence of preliminary injunctive relief from the district court; (3) the balance of equities tips in the Board's favor; and (4) the injunction is in the public interest. *Frankl*, 650 F.3d at 1355. Alternatively, an injunction may issue under a "sliding scale" approach if there are serious questions going to the merits and the balance of equities tips sharply in the plaintiff's favor. *Alliance for the Wild Rockies v.*

*Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011). "[S]erious questions are those 'which cannot be resolved one way or the other at the hearing on the injunction.'" *Bernhardt v. Los Angeles Cty.*, 339 F.3d 920, 926-27 (9th Cir. 2003) (quoting *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988)). They "need not promise a certainty of success, nor even present a probability of success, but must involve a 'fair chance of success on the merits.'" *Marcos*, 862 F.2d 1362 (quoting *Nat'l Wildlife Fed'n v. Coston*, 773 F.2d 1513, 1517 (9th Cir. 1985)). The plaintiff, however, must still show a likelihood of irreparable harm under either theory. *Alliance for the Wild Rockies,* 632 F.3d at 1135. "Due to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings*." Herb Reed Enters., LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 n. 5 (9th Cir. 2013).

## IV.    DISCUSSION

Because the Court finds that Petitioner has not satisfied the likelihood of irreparable harm prong, the Court declines to address the other elements.

To show likelihood of irreparable harm, a plaintiff must demonstrate that irreparable injury is "*likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). However, it is not enough that the claimed harm be irreparable; the harm must also be imminent. *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1998).

Applying this standard to petitions brought pursuant to section 10(j), the Regional Director must show that the claimed harm is likely to occur absent the district court's issuance of a preliminary injunction. *Avanti Health Sys., LLC*, 661 F.3d at 1191. The Ninth Circuit has held that "the Director need not prove that irreparable harm is certain or even nearly certain." *Id*. Rather, irreparable harm results where an alleged unfair labor practice is allowed to "reach fruition," thereby rendering the Board's subsequent remedial authority meaningless. *Id*.; *see also Frankl*, 650 F.3d at 1362 ("Irreparable injury is established if a likely unfair labor practice is shown along with a present or impending

deleterious effect of the likely unfair labor practice that would likely not be cured by later relief."). Thus, interim injunctive relief under section 10(j) "preserve[s] or restore[s] the status quo while the parties are awaiting a resolution of the unfair labor practice dispute by the Board." *Aguayo for and on Behalf of N.L.R.B. v. Tomco Carburetor Co.*, 853 F.2d 744, 747 (9th Cir. 1988) (citing *Johansen v. Queen Mary Rest. Corp.*, 552 F.2d 6, 7 (9th Cir. 1975) (per curiam)), *overruled on other grounds, Miller v. California Pacific Medical Center*, 19 F.3d 449 (9th Cir. 1994).

Petitioner has not established that the Court can preserve or restore the status quo to prevent the alleged unfair labor practices from reaching fruition. The claimed harm in Petitioner's brief appears to be both stimulating support for the Union and preventing any further decrease in the hospice nurses' support for the Union. (ECF No. 3 at 24.) However, Petitioner fails to affirmatively show that hospice nurses currently employed at the Medical Center support the Union or that there has been any support for the Union since November 2015. (*See* ECF No. 3-1 at 134-35.) The apparent lack of support is further buttressed by Welsh's affidavit in which he states that, after informing the hospice nurses via email on August 20, 2016, that the order in the 669 Case had been overturned and there had been a direction for election, only one hospice nurse spoke with him. (*Id.* at 135.) This nurse informed Welsh that, as far as she knew, the hospice nurses' views remained consistent with the November 2015 Letter. (*Id.*) This evidence supports Respondent's argument that the status quo cannot be revived at this point in time. Given the lack of any evidence of support for the Union since November 2015, the Union cannot establish that the absence of preliminary injunctive relief will likely result in irreparable harm. Such absence of evidence supports Respondent's argument that any final relief will be just as effective as interim relief.

In their brief, Respondent focuses heavily on the delay between the termination of May (August 11, 2015) and the filing of the Petition (April 7, 2017). Petitioner cites to a

///

///

series of cases, including two from the Ninth Circuit,[4] to argue that the delay in time between May's termination and the filing of the section 10(j) petition does not affect the ability of the Union to restore or revive the status quo. (*See* ECF No. 3 at 25-26.)

While delay by itself is not a determinative factor in deciding whether interim injunctive relief is just and proper, delay is significant if the claimed harm has already occurred and the parties cannot be returned to the status quo or if the Board's final order will likely be as effective as an order for interim relief.[5] *Aguayo*, 853 F.2d at 750 (citing *Gottfried v. Frankel*, 818 F.2d 485, 495 (6th Cir. 1987) and *Solien v. Merchants Home Delivery Serv., Inc.*, 557 F.2d 622, 627 (8th Cir. 1977)). Moreover, in *Aguayo*, the court asked the additional question of whether interim relief—there, reinstatement of employees—would revive the union's organizational campaign. *See id.* The court reasoned that if the interim relief would not revive the status quo, then the relief sought—there, an order of reinstatement of eleven employees—would be an "empty formality." *Id.* at 749 (quoting *Angle v. Sacks*, 382 F.2d 655, 660 (10th Cir. 1967); *see also Avanti Health Sys., LLC*, 661 F.3d at 1192 ("[A] delay in bargaining weakens support for the union, and a Board order cannot remedy this diminished level of support.").

Similarly here, Petitioner has not shown that the interim relief requested would preserve or restore the status quo. The hospice nurses expressed that they were no

---

[4]The Court finds the facts here are distinguishable from the facts presented in the two Ninth Circuit cases. First, in *Aguayo*, the employees who were eventually reinstated were terminated in July and August of 1987. 853 F.2d at 746. The section 10(j) petition was then filed on December 14, 1987. *Id.* Despite the fact that reinstatement did not actually occur until the Ninth Circuit's decision on August 5, 1988, the court's determination was based on the facts as presented by the petitioner in December of 1987. *See id.* at 750-51. At that time, only four months had transpired between the firing of employees and the filing of the petition. *Id.* at 750. *Frankl* involved a longer delay than the one in this case—roughly two years. However, during that time period union support persisted and the ALJ had issued an order finding in favor of the Union.

[5]"Normally there is a significant delay before the Board issues its ruling in an unfair labor practice proceeding." *Aguayo*, 853 F.2d at 747; *see also Angle v. Sacks*, 382 F.2d 655, 659-60 (10th Cir. 1967) ("The concern of Congress was rather that the purposes of the National Labor Relations Act could be defeated in particular cases by the passage of time."). Thus, section 10(j) was enacted so that any delay would not thwart the NLRA's objective of protecting the collective bargaining process. *Aguayo*, 853 F.2d at 747.

longer interested in supporting the Union in November 2015. (ECF No. 3-1 at 134-35.) The ALJ's subsequent order directing an election in August 2016 received no support from the hospice nurses. (*Id.* at 135.) According to Welsh, he also called some of the hospice nurses to tell them the same news, but only one nurse answered his call and she informed him that she was no longer interested in joining the Union and that, as far as she knew, the opinions of the other hospice nurses had not changed since they sent the November 2015 Letter. (*Id.* at 135-36.) The Union offered no evidence to suggest any indicia of support for the Union or any change in such support despite the positive news resulting from the ALJ's order directing an election in August 2016. Thus, the lapse in time, coupled with the lack of any evidence from Petitioner that support for the Union may be restored, would render the Court's granting of interim relief "an empty formality." While consideration of the extended timeline by which the Board addresses labor disputes is an inherent factor in the court's analysis, the delay here has affected the Court's ability to restore the status quo pending a final decision by the Board.

Moreover, Petitioner presents no evidence that the claimed harm is imminent to support a finding of irreparable harm. *See Caribbean Marine Servs. Co.*, 844 F.2d at 674 ("A plaintiff must do more than merely allege imminent harm . . . a plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief.") For instance, the Ninth Circuit has found that an "observed drop-off in union activity, as evidenced by a decline in the number of union authorization cards signed and in attendance at union organizing meetings . . . can be evidence that irreparable harm is likely absent a preliminary injunction." *Overstreet v. Shamrock Foods Co.*, No. 16-15172, 2017 WL 655795, at *2 (9th Cir. Feb. 17, 2017). Petitioner does not provide the Court with any affirmative evidence of indicia of support for the Union between the November 2015 Letter and the April 7, 2017, filing of the Petition, let alone any evidence amounting to an "observed-drop off" in the hospice nurses' support for the Union.

Thus, the Court fails to find the existence of an immediate threatened injury at this point in time and is thereby precluded from granting preliminary injunctive relief.

## V. CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the Petition.

It is hereby ordered that Petitioner's petition for interim injunctive relief pursuant to section 10(j) of the NLRA is denied.

The Clerk is instructed to close this case.

DATED THIS 18th day of May 2017.

                    MIRANDA M. DU
                    UNITED STATES DISTRICT JUDGE